**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Auto-Owners Insurance Company, | No. CV-24-00114-PHX-SHD |
| Plaintiff, | **ORDER** |
| v. | |
| Marisa McNally, et al., | |
| Defendants. | |

On August 20, 2024, Plaintiff/Counterdefendant Auto-Owners Insurance Company ("Auto-Owners") filed a Motion to Dismiss Counterclaim.  (Doc. 24.)  On October 24, 2024, Auto-Owners also filed an Application for Entry of Default Against Defendant Marisa McNally, (Doc. 37), and after the Court ordered a response, (Doc. 39), Griffen Roy and Corina Farcasanu[1] filed a Motion to Set Aside Application for Entry of Default, (Doc. 40).  The Court will now **grant in part** the motion to dismiss, **deny** the application for entry of default, and **deny** the motion to set aside application for entry of default as moot.

## I.    FACTUAL AND PROCEDURAL BACKGROUND[2]

On February 27, 2022, McNally, after consuming alcohol, was involved in an

---

[1]    As discussed in greater detail below, Roy and Farcasanu have appeared as the defendants/counterclaimants in this action in place of McNally based on their allegation McNally assigned her claims, rights and defenses against Auto-Owners to them.  (Doc. 20 at 2.)  Accordingly, they will be referred to as "Assignees" in this Order.

[2]    The facts set forth below are those alleged in the First Amended Complaint (Doc. 12) and are not disputed by Assignees in their Answer and Counterclaim (Doc. 20).

automobile accident with Assignees. (Doc. 12 ¶¶ 13–14.) At the time of the accident, the vehicle McNally was driving was insured under a policy issued to McNally by "Progressive." (*Id.* ¶ 16.) Separately, McNally's parents and/or their trust maintained three policies, issued by Auto-Owners, that were in effect at the time of the accident: (1) an automobile policy (the "Automobile Policy"); (2) a condominium policy (the "Condo Policy"); and (3) an umbrella policy (the "Umbrella Policy"), for which the Automobile Policy and Condo Policy were the underlying policies. (*Id.* ¶¶ 6–8; Doc. 20 at ¶ 6.) The Umbrella Policy provides certain liability coverage in excess of the Automobile and Condo Policies, up to $4,000,000 per occurrence. (Doc. 12 at ¶ 7.) McNally is not a named insured on any of the Auto-Owners policies, but she resided in the condo covered by the Condo Policy. (*Id.* ¶¶ 9, 17.) The Umbrella Policy provides coverage to a "relative who resides in [the named insureds'] household". (Doc. 20 at ¶ 19; *see also* Doc. 12 at ¶ 26.)

In 2023, Assignees sued McNally for injuries they suffered in the car accident. (Doc. 12 at ¶¶ 19–21.) McNally tendered the defense of the lawsuits to Auto-Owners, which disclaimed coverage under the Automobile Policy and Condo Policy, and reserved its rights with respect to the Umbrella Policy, agreeing to appoint counsel to monitor the defense of the lawsuits as a potential excess carrier. (*Id.* ¶¶ 22–25.) Auto-Owners explained its reservation of rights in a July 11, 2023 letter as follows: "To the extent McNally was not residing in the household of the named insureds – i.e., the Trust and Krainz and McNally, its Trustees – she is not considered an insured under the umbrella policy and is, therefore, not entitled to coverage." (Doc. 24-2 at 6.)

On January 17, 2024, Auto-Owners sued McNally seeking a declaration of its rights and obligations under the Umbrella Policy, (Doc. 1), and later filed a First Amended Complaint in which it sought "a judicial determination that Auto-Owners has no obligation to provide coverage to McNally with regard to any claims arising out of the Accident," (Doc. 12 at 7.) On July 25, 2024—five days before the deadline for McNally to respond to the First Amended Complaint—she sent a letter to Auto-Owners in which she (a) explained in detail why she believed she was covered by the Umbrella Policy as a

relative residing in her parents' household, (b) disclosed that Assignees had expressed an interest in acquiring her rights and claims against Auto-Owners in exchange for their agreement not to pursue her personal assets, and (c) offered Auto-Owners the opportunity to withdraw its reservation of rights, dismiss this lawsuit, and extend coverage to her by to avoid her assigning her rights to Assignees.  (Doc. 24-3 at 2–4.)  Auto-Owners did extend coverage to McNally and on July 30, 2024, McNally and Assignees executed an Agreement to Assign All Claims, Rights and Defenses to Insurance Claims and Benefits (the "Assignment Agreement").  (Doc. 24-4.)[3]

That same day, Assignees—standing in the name and position of Marissa McNally—answered the First Amended Complaint and asserted counterclaims against Auto-Owners for breach of contract, bad faith, and punitive damages.  (Doc. 20 at 2 ("Defendants/Counterclaimants Roy and Farcasanu are the assignees of Marisa McNally with respect to any claims and defenses she may have against Plaintiff Counter-defendant Auto-Owners arising out of the failure of Auto-Owners to provide Marisa McNally unreserved coverage under the Umbrella Policy.").)  Auto-Owners moved to dismiss the counterclaims under Rule 12(b)(6).  (Doc. 24.)  That motion is fully briefed.  (Docs. 30, 35.)

Additionally, on October 24, 2024, Auto-Owners applied for entry of default against McNally because she did not personally respond to the First Amended Complaint.  (Docs. 37–38.)  The Court ordered Assignees and/or McNally to respond to the default application, (Doc. 39), and Assignees effectively did so by filing a Motion to Set Aside Application for Entry of Default, (Docs. 40–42.)  The default application and motion to set aside are fully briefed.  (Docs. 43, 44.)

---

[3]    Although neither the July 25 letter nor the Assignment Agreement were attached to the Answer and Counterclaim, (Doc. 20), they are referenced in that document and therefore may be considered on this motion to dismiss.  *See, e.g.*, *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003) (courts may consider documents incorporated by reference in the complaint, including if the plaintiff refers to the document extensively or the document forms the basis of the claim).

## II.      DISCUSSION

### A.      Auto-Owners' Motion to Dismiss Counterclaims

Auto-Owners seeks dismissal of Assignees' counterclaims on two grounds: (1) that Assignees lack standing to assert the counterclaims because the Assignment Agreement is invalid, and therefore they cannot assert rights originally held by McNally as the putative insured; and (2) even if the Assignment Agreement was valid, each of the counterclaims fails to state a claim upon which relief can be granted.  Each argument is addressed in turn.

#### 1.      Assignees' Standing

##### a.      Applicable Law

"Assignees of a claim . . . have long been permitted to bring suit." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 275 (2008) (holding that assignees of claims have Article III standing); *see also Misic v. Bldg. Serv. Emps. Health & Welfare Tr.*, 789 F.2d 1374, 1378 n.4 (9th Cir. 1986) (noting the "familiar principle that the assignee stands in the shoes of the assignor, and, if the assignment is valid, has standing to assert whatever rights the assignor possessed").  Under Arizona law, when an insurer denies coverage to its insured, an insured defendant may enter into an agreement in the underlying action in which the insured "admits to liability and assigns to a plaintiff his or her rights against the liability insurer . . . in exchange for a promise . . . not to execute the judgment against the insured." *Safeway Ins. Co v. Guerrero*, 106 P.3d 1020, 1022 n.1 (Ariz. 2005).  These agreements generally take two forms: (1) *Damron* agreements, which arise in the context of an "insurer's refusal to defend the insured," and (2) *Morris* agreements, which "can be prompted by a number of circumstances," including when an insurer has reserved its rights, anticipatorily breached its duty to indemnify, or failed to settle in bad faith. *Id.* (citing *Damron v. Sledge*, 460 P.2d 451 (Ariz. 1969) and *United Servs. Auto. Ass'n v. Morris*, 741 P.2d 246 (Ariz. 1987)).

"*Morris* agreements are designed to reconcile the 'conflicting interests' of an insured and a liability insurer in certain difficult situations." *Id.* at 1024.  "While an insurer with a good faith policy defense has a right to dispute coverage, the insured is thereby

1    placed in a precarious position" such that they may "protect themselves from the sharp

2    thrust of personal liability" by entering into such agreements without violating the

3    cooperation clause of an insurance contract. *Id.* (citations and quotation marks omitted).

4    In such situations, however, the "insureds (or their assignees) [must] show that any *Morris*

5    agreement is free of fraud or collusion . . . and reasonable in amount," *id.* (citations and

6    quotation marks omitted), and must provide "notice to the insurer," *Morris*, 741 P.3d at

7    252.  Moreover, if the insurer ultimately demonstrates that the claim is not covered by the

8    pertinent policy, it has no liability under the *Morris* agreement.  *Guerrero*, 106 P.3d at

9    1024.

10                    b.    <u>Validity of the Assignment Agreement under Arizona Law</u>

11           Auto-Owners first asks the Court to deem the Assignment Agreement invalid

12    because Auto-Owners is an excess carrier that did not breach any duty to defend, arguing

13    that *Morris*-type agreements are available only in situations where the insurer breached a

14    duty to defend.  (Doc. 24 at 8–11.)    In making this argument, Auto-Owners incorrectly

15    conflates *Damron* agreements and *Morris* agreements.  While *Damron* agreements arise

16    following "an insurer's refusal to defend the insured," *Morris* agreements arise in "a

17    number of circumstances" including those involving a "reservation of rights by [an]

18    insurer" or an "alleged anticipatory breach of [the] insurer's duty to indemnify." *Guerrero*,

19    106 P.3d at 1022 n.1.  The Assignment Agreement here is a *Morris*-type agreement.  Auto-

20    Owners reserved its rights as to its indemnification obligation under the Umbrella Policy

21    and later filed this action seeking a declaration that it owed no coverage to McNally, putting

22    her in the precarious position of facing personal liability for any judgment exceeding her

23    primary policy coverage limits.  After being placed in that situation, McNally "admit[ed]

24    to liability and assign[ed] to [Assignees] . . . her rights against [Auto-Owners] . . . in

25    exchange for a promise . . . not to execute the judgment against" her.  *Id.*  Auto-Owners

26    cites no caselaw supporting its position that a *Morris* agreement executed under these

27    circumstances is invalid under Arizona law.

28           Moreover, its reliance on *Geurden v. Quantum Transportation LP*, 298 F. Supp. 3d

1222 (D. Ariz. 2018), is misplaced. In that case, the court found that an agreement executed under similar circumstances was, in fact, a *Morris* agreement. *See id.* at 1226. The insureds in *Geurden* stipulated to a judgment after a primary insurer demanded that the excess carrier tender its policy limits and the excess carrier responded by denying that it had any "duty to defend and/or indemnify" as the "insurance policy was excess to policies of other insurers that were . . . providing a defense." *Id.* at 1224. When the parties in the underlying litigation asked the court to enter the stipulated judgment, the court inquired as to whether it needed to conduct a reasonableness hearing before entering the judgment, explaining that courts do "not conduct a reasonableness inquiry" for *Damron* agreements, but "must inquire into *Morris* agreements for their reasonableness." *Id.* at 1225.

After briefing by the parties and the excess carrier, which had intervened, the court ruled that a reasonableness hearing was required. Although the parties to the stipulated judgment characterized it as "a '*Damron* Agreement,'" *id.* at 1224–25, the court concluded that it could not have been a *Damron* agreement because the excess carrier had no duty to defend at the time of the stipulation and thus could not have breached any duty to defend, *id.* at 1226–27 (finding that alleged anticipatory breach of duty to defend by the excess carrier could not give rise to a *Damron* agreement). Instead, the Court determined that the circumstances gave rise to a *Morris* agreement entitling the excess carrier to a reasonableness hearing. *Id.* at 1227. Thus, *Geurden* belies Auto-Owners' argument that there can be "no valid assignment of claims by an insured against an excess carrier." (Doc. 25 at 8.)

Auto-Owners next argues that the Assignment Agreement is invalid because McNally failed to provide "proper notice." (Doc. 24 at 11–12.) While an insurer is entitled to notice of an impending *Morris* agreement, *see, e.g.*, *Morris*, 741 P.3d at 252, Auto-Owners received such notice on July 25, 2024, when McNally informed Auto-Owners about the impending agreement and offered it the opportunity to waive its reservation of rights and accept coverage:

> The underlying Plaintiffs Roy and Farcasanu have expressed an

interest in acquiring an assignment of the rights and claims of my client against Auto-Owners in exchange for a promise by Roy and Farcasanu not to pursue the personal assets of my client and agreement to the amount of damages sustained by Roy and Farcasanu. **This letter is an offer to forego such an assignment and agreement if Auto-Owners withdraws its reservation of rights, dismisses the Declaratory Action, and agrees to coverage under the Umbrella Policy for Marisa McNally with respect to the February 27, 2022 collision.**

(Doc. 24-3 at 3–4 (emphasis in original).)  Auto-Owners does not dispute that it received the July 25 letter and instead argues that the notice was inadequate because Auto-Owners "was given two days" to agree to coverage, was not provided with a draft of the Assignment Agreement, was not informed of the amount of the proposed stipulated judgment, and was not given the opportunity to defend.  But Auto-Owners does not cite any caselaw in support of its argument that it was entitled to additional time to accept coverage or additional information about the impending *Morris* agreement.  Nor does it suggest that it ever asked McNally for additional time or additional information to consider her offer.  Under these circumstances—and at this early stage of the case—the Assignment Agreement will not be deemed invalid and the counterclaims will not be dismissed for lack of standing.  *Cf. Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (standing "must be supported . . . with the same manner and degree of evidence required at the successive stages of the litigation," which, at the pleading stage, requires only "general allegations [that] embrace those specific facts . . . necessary to support the claim.").

### 2. Failure to State a Claim

#### a. Rule 12(b)(6) Standard

Dismissal of a claim for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) "may be based on either a 'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'"  *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).  In determining whether a claim satisfies this standard, the claimant's allegations are taken as true, and the pleadings are construed

1    in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of*
2    *Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007). A pleading must contain "a short and plain
3    statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).
4    To survive a motion to dismiss, a complaint must state a claim that is "plausible on its
5    face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*,
6    550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual
7    content that allows the court to draw the reasonable inference that the defendant is liable
8    for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court need not accept as true
9    "conclusory statements" or "legal conclusions." *Id.*

b.    Breach of Contract Counterclaim

11        The elements of a breach of contract claim are "the existence of the contract, its
12   breach and resulting damages." *Graham v. Asbury*, 540 P.2d 656, 657 (Ariz. 1975). Here,
13   Auto-Owners asserts that Assignees' breach of contract counterclaim must be dismissed
14   because Assignees have not, and cannot, allege a breach of any contractual given that "no
15   duty has arisen or was otherwise imposed upon Auto-Owners as an excess carrier under
16   the circumstances." (Doc. 24 at 12–13.) It further argues that because it breached no
17   contractual obligation, it has not caused any damages. (*Id.* at 13.)

18        Although Assignees generally allege that Auto-Owners owed McNally coverage as
19   "a relative resident in the insured household" and breached the insurance contract, (Doc.
20   20 at 6 ¶¶ 4-7), they do not allege which specific contractual obligation Auto-Owners
21   breached, when that obligation arose, or how they have been damaged by the alleged
22   breach. (Doc. 20 at ¶¶ 3-7.) These omissions are problematic in this case because "Arizona
23   courts . . . hold that 'until a primary insurer offers its policy limit, the excess insurer does
24   not have a duty to evaluate a settlement offer, to participate in the defense, or to act at all.'"
25   *Geurden*, 298 F. Supp. 3d at 1227 (quoting *Twin City Fire Ins. Co. v. Burke*, 63 P.3d 282,
26   287 (2003)). Assignees have not alleged facts sufficient to state a plausible breach of
27   contract claim and instead rely on conclusory allegations. Accordingly, their breach of
28   contract will be dismissed for failure to state a claim.

Because Assignees could theoretically amend their counterclaims to allege facts sufficient to state a breach of contract claim against Auto-Owners, they will be granted leave to amend. *See Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts."); Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given "when justice so requires").

### c.     Bad Faith Counterclaim and Punitive Damages

"Arizona law implies a covenant of good faith and fair dealing in every contract." *Wells Fargo Bank, N.A. v. Ariz. Laborers, Teamsters & Cement Masons Local No. 395 Pension Tr. Fund*, 38 P.3d 12, 28 (Ariz. 2002). In the insurance context, "there is a legal duty implied in an insurance contract that the insurance company must act in good faith in dealing with its insured on a claim, and violation of that duty of good faith is a tort." *Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.3d 1265, 1267 (Ariz. 1992) (quotation marks omitted). Third party bad faith claims involve allegations that "the insurer acted in bad faith in its duty to indemnify or protect the insured from third-party claims." *Satamian v. Great Divide Ins. Co.*, 545 P.3d 918, 928 (Ariz. 2024).

Auto-Owners argues that Assignees' have failed to state a claim for bad faith and that their associated punitive damages claim must also be dismissed. (Doc. 24 at 13–14.) With respect to the bad faith counterclaim, Auto-Owners makes two arguments in support of dismissal: (1) that Assignees improperly allege the same conduct by Auto-Owners upon which they based their breach of contract claim, and (2) that Auto-Owners' filing of this declaratory judgment action cannot by itself support a bad faith claim. (*Id.*) In making these arguments, however, Auto-Owners ignores the actual allegations in the counterclaim, which include that Auto-Owners failed to investigate and act reasonably in evaluating the coverage claim by withholding information from McNally, failed to consider her interests while serving its own interests to her detriment, and imposed "needless adversarial hoops." (Doc. 20 at ¶¶ 11–19.) Auto-Owners' failure to substantively engage with the allegations

set forth in the counterclaim require rejection of its argument.  Furthermore, because the bad faith claim will not be dismissed, there is no basis to dismiss Assignees' associated claim for punitive damages.

**B.    Application for Entry of Default and Motion to Set Aside**

A party seeking default must show by affidavit or otherwise that "the party against whom a judgment . . . is sought has failed to plead or otherwise defend."  Fed. R. Civ. P. 55(a).  Here, Auto-Owners does not dispute that the Assignees answered and are defending this declaratory judgment action, and instead argue it is entitled to default because McNally did not personally respond to the First Amended Complaint.  (Docs 37–38, 43.)  In its application for entry of default, supporting declaration, and response to the motion to vacate application for entry of default, however, Auto-Owners fails to cite a single rule, statute or case supporting its argument that a party that has assigned its rights under an insurance policy must personally appear to defend itself in a declaratory judgment action filed by the insurer.  (*Id.*)  Auto-Owners' argument is inconsistent with one of the core elements of a *Morris* agreement, which is the assignment of the insured's rights under the insurance contract to the injured party.  Given that the Assignment Agreement will not be deemed invalid at this early stage of the case, Auto-Owners has failed to satisfy is burden under Rule 55(a) and the court will not enter default against Assignees.  Because the Court declines to enter default, it will deny as moot Assignees' motion to set aside the application for entry of default.

Accordingly,

**IT IS ORDERED** that Auto-Owners' motion to dismiss counterclaim (Doc. 24) is **granted in part and denied in part**, as follows:

(1) Count One for breach of contract is dismissed with leave to amend.

(2) Counts Two and Three for bad faith and punitive damages may proceed.

**IT IS FURTHER ORDERED** that Assignees may have **14 days** to file a First Amended Counterclaim.  Consistent with LRCiv 15.1, Assignees shall file, concurrently with any amended counterclaim, a notice of filing the amended pleading that attaches a

1    copy of the amended pleading indicating in what ways it differs from the original

2    counterclaim.

3        **IT IS FURTHER ORDERED** denying Auto-Owners' application for entry of

4    default (Doc. 37).

5        **IT IS FURTHER ORDERED** denying as moot Assignees' motion to set aside

6    application for entry of default (Doc. 40).

7        Dated this 6th day of November, 2025.

8

9

10

11

12                                                    _____

13                                                    Honorable Sharad H. Desai
                                                      United States District Judge
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28